**This Opinion is a Precedent of the TTAB**

Mailed: May 3, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

——

Trademark Trial and Appeal Board

——

*In re National Concessions Group, Inc.*

——

Serial No. 87168058
Serial No. 87183434

——

Pamela N. Hirschman, Todd P. Blakely and Jeanette E. Sinclare of Sheridan Ross P.C., for National Concessions Group Inc.

Jeffrey J. Look, Trademark Examining Attorney, Law Office 130, John Lincoski, Managing Attorney.

——

Before Thurmon, Deputy Chief Administrative Trademark Judge, Greenbaum and English, Administrative Trademark Judges.

Opinion by Greenbaum, Administrative Trademark Judge:

## I.  Procedural History

National Concessions Group, Inc. ("Applicant"), self-identified as "the Largest Cannabis Company in the US,"[1] seeks registration on the Principal Register of the

---

[1] November 7, 2017 Office Action, TSDR 16-18 (November 7, 2016 press release issued by Applicant, titled "Bakked is the Newest Brand from the Largest Cannabis Company in the US," posted on the MARKETWIRED.COM website). All references to the applications and Briefs/Board Orders are to the TSDR record and TTABVUE file, respectively, in Application Serial No. 87168058, unless otherwise specified.

marks BAKKED (in standard characters) and a stylized drop design mark, displayed

as  , both for

> Essential oil dispenser, sold empty, for domestic use, in International Class 21.[2]

In each application, Applicant submitted a single, identical specimen showing the two marks (and a third mark, "THE DABARATUS," which is not involved in this consolidated appeal) on the goods:



May 5, 2017 Amendment to Allege Use, TSDR 2.

The Trademark Examining Attorney refused registration of each mark based on the contention that the identified goods are unlawful drug paraphernalia under the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 863, and thus cannot be sold in lawful commerce under Sections 1 and 45 of the Trademark Act, 15 U.S.C. §§ 1051 and 1127. Applicant posits that the goods are not drug paraphernalia under the CSA's definition of the term because they are used to dispense essential oil, and in the

---

[2] Application Serial No. 87168058 (BAKKED) was filed on September 12, 2016, and Application Serial No. 87183434 (stylized drop design mark) was filed on September 26, 2016, both based upon Applicant's allegation of a bona fide intention to use the mark in commerce under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b). Applicant filed Amendments to Allege Use on May 5, 2017 and May 8, 2017, respectively, claiming, in each instance, November 29, 2016 as the date of first use anywhere and use in commerce.

Application Serial No. 87183434 includes the following description of the mark: "The mark consists of two parallel curved lines forming a teardrop, being wrapped around a smaller solid teardrop." Color is not claimed as a feature of the mark.

alternative, that Colorado state law permits Applicant to manufacture and sell the identified goods, so even if the goods otherwise would be considered prohibited drug paraphernalia under the CSA, one or both exemptions set out in Sections 863(f)(1) and 863(f)(2) of the CSA, 21 U.S.C. §§ 863(f)(1) and 863(f)(2) (discussed below), make the goods lawful under federal law, and thus eligible for federal trademark registration.[3]

Applicant appealed the refusal and requested reconsideration in each application. The requests for reconsideration were denied.

After the appeals were fully briefed,[4] 7, 11 and 12 TTABVUE, the Board suspended and remanded the applications to the Examining Attorney to issue a nonfinal Office Action in each application requesting information from Applicant under Trademark Rule 2.61(b), 37 C.F.R. § 2.61(b), concerning the legislative histories of Sections 863(f)(1) and 863(f)(2) of the CSA, and the provisions of the Colorado Constitution and Colorado Criminal code that Applicant cited and relied on in its briefs.[5] 15 TTABVUE.

---

[3] Article XVIII, Section 16(f) of the Colorado Constitution permits the manufacture and sale of "marijuana accessories," which are defined as "any equipment, products … which are used, intended for use, or designed for use in … repackaging, storing, vaporizing, or containing marijuana, or for ingesting, inhaling, or otherwise introducing marijuana into the human body …." Colo. Const. art. XVIII, §§ 16(f) and 16(2)(g) (2018). October 24, 2018 Final Office Action, TSDR 12, 10. And the definition of "drug paraphernalia" in the Colorado Criminal Code excludes "any marijuana accessories as defined in section 16(2)(g) of article XVIII of the state constitution." C.R.S. 18-18-426 (2018). *Id.*, at TSDR 6-7.

[4] The Board consolidated proceedings after Applicant filed its Appeal Brief, 7 TTABVUE, and at the Examining Attorney's request, 9 TTABVUE, because the appeals present the same issue and are based on the same records. 10 TTABVUE.

[5] The Examining Attorney followed the Board's instructions and issued a nonfinal Office Action on June 30, 2020 with a Request for Information. Applicant submitted multiple documents comprising more than 700 pages in response, including, inter alia, information

On February 5, 2021, the Examining Attorney issued a Supplemental Final Office Action in each application maintaining and continuing the refusal under Sections 1 and 45 of the Trademark Act. The Board resumed proceedings and allowed Applicant and the Examining Attorney time to file Supplemental Appeal Briefs, 17 TTABVUE, which they did. 18, 21 and 22 TTABVUE.

We affirm the refusal to register in each application.

## II. Applicable Law

Under Section 1(a) of the Trademark Act, a mark may not be registered unless it is "used in commerce." Section 45 of the Trademark Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade." In addition, "[t]he word 'commerce' means all commerce which may lawfully be regulated by Congress." *Id*. Section 45 further specifies that "use in commerce" of a mark for goods occurs when the mark "is placed in any manner on the goods . . . and the goods are sold or transported in commerce." *Id*.

"A valid application cannot be filed at all for registration of a mark without 'lawful use in commerce….'" *Gray v. Daffy Dan's Bargaintown*, 823 F.2d 522, 3 USPQ2d 1306, 1308 (Fed. Cir. 1987). The Board also has "consistently held that, to qualify for a

---

about the CSA, the Colorado Constitution and Criminal code; the "Cole Memorandum" and its subsequent rescission via the "Sessions Memorandum"; and the "Rohrabacher-Farr Amendment." December 15, 2020 Response to Office Action, TSDR 2-721 (generally). But as one commentator noted, "there is scant legislative history regarding the authorization exemption. As a result, little is known about how Congress intended the provision to operate." Breanna C. Phillips, Note, "The Authorization Continuum: Investigating the Meaning of 'Authorization' Through the Lens of the Controlled Substances Act." 72:4 Vand. L. Rev. 1335, 1344-45 (2019). December 15, 2020 Response to Office Action, TSDR 135, 144-45.

federal … registration, the use of a mark in commerce must be 'lawful'" under federal law in the sense that the commerce recited in the application complies with applicable federal laws that regulate the goods. *In re PharmaCann LLC*, 123 USPQ2d 1122, 1123-24 (TTAB 2017) (quoting *In re JJ206, LLC*, 120 USPQ2d 1568, 1569 (TTAB 2016) and *In re Brown*, 119 USPQ2d 1350, 1351 (TTAB 2016) (affirming unlawful use refusals to register marks for marijuana-related products or services)). *See also Coahoma Chem. Co. v. Smith*, 113 USPQ 413, 418 (Comm'r. Pat. 1957), *aff'd on other grounds*, 264 F.2d 916, 121 USPQ 215 (CCPA 1959) ("[U]se of a mark in connection with unlawful shipments in interstate commerce is not use of a mark in commerce which the Patent [and Trademark] Office may recognize."); 37 C.F.R. 2.69 (providing for inquiry to assess the lawfulness of the commerce recited in an application). Thus, for a mark to be eligible for federal registration, "any goods … for which the mark is used must not be illegal under federal law." *PharmaCann*, 123 USPQ2d at 1124 (quoting *JJ206*, 120 USPQ2d at 1569 and *Brown*, 119 USPQ2d at 1351). The lawful use requirement avoids putting the USPTO "in the anomalous position of accepting as a basis for registration a shipment in commerce which is unlawful under a statute specifically controlling the flow of such goods in commerce." *In re Stellar Int'l Inc.*, 159 USPQ 48, 51 (TTAB 1968).

A.    Controlled Substances Act – Drug Paraphernalia

Section 863(a) of the CSA makes it unlawful to (1) sell or offer for sale, (2) use the mails or any other facility of interstate commerce to transport, or (3) import or export drug paraphernalia. Drug paraphernalia is defined as "any equipment, product, or

material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance, possession of which is unlawful under [the CSA]." 21 U.S.C. § 863(d); *see also JJ206*, 120 USPQ2d at 1569. The CSA identifies marijuana and marijuana-based preparations as controlled substances that are unlawful to possess. 21 U.S.C. § 812(a) & (c) (identifying "Marihuana," by its alternate spelling, as a controlled substance); 21 U.S.C. §§ 841 & 844 (placing prohibitions on the possession of controlled substances). Thus, equipment or products primarily intended or designed for use in ingesting, inhaling, or otherwise introducing marijuana into the human body (e.g., water pipes, roach clips and bongs) constitute unlawful drug paraphernalia under Section 863(d) of the CSA, but for two exemptions set out in Section 863(f).

> This section shall not apply to–
>
> 1. any person authorized by local, State, or Federal law to manufacture, possess, or distribute such items; or
>
> 2. any item that, in the normal lawful course of business, is imported, exported, transported, or sold through the mail or by any other means, and traditionally intended for use with tobacco products, including any pipe, paper, or accessory.

As summarized above, Applicant argues that its goods do not fall within the meaning of "drug paraphernalia" under Section 863(d) of the CSA because they are used to dispense essential oil, and in the alternative, that its goods qualify for an exemption under either Section 863(f)(1) of the CSA because Applicant is "authorized

by" Colorado state law to "manufacture, possess, or distribute" the goods, or Section 863(f)(2) of the CSA because Applicant's goods are of the type traditionally intended for use with tobacco products.

B.    Analysis

1.    Are Applicant's Identified Goods Prohibited Drug Paraphernalia?

We consider first whether Applicant's "essential oil dispenser, sold empty, for domestic use" is prohibited drug paraphernalia under Section 863(d) of the CSA. This product is not unlawful as identified in the application. However, if the identification of goods or services in an application does not reveal a per se violation of the CSA, as in *JJ206*, 120 USPQ2d at 1570 (applicant's "identified goods fall within the definition of illegal drug paraphernalia under the CSA"), extrinsic evidence may be used to show such a violation. *Brown*, 119 USPQ2d at 1351-52 (applicant's specimen and website showed that its "retail store services featuring herbs" included the sale of marijuana).[6] The Examining Attorney contends that Applicant's essential oil dispenser is illegal drug paraphernalia under § 863(d) of the CSA, because its primary intended purpose is to dispense premeasured amounts of cannabis-based oil to a vaping or smoking device for "dabbing."

As background, the Examining Attorney submitted several articles collectively explaining the "dabbing" process as a means or method of inhaling superheated cannabis concentrates to produce a quicker "high" than by smoking marijuana in herb

---

[6] Section 863(e) of the CSA also provides guidance for determining whether a product constitutes drug paraphernalia, including reviewing the instructions on how to use the item, and the manner in which the item is displayed for sale.

or flower form, or by consuming it in an edible product. This evidence describes "dabbing" as a relatively new trend in which cannabinoids and terpenes from cannabis are extracted and concentrated into a liquid oil or semi-solid wax; the concentrate is applied to specialized devices, such as "nails" or "dab rigs" (which are attachments to bongs or pipes); and the concentrate is heated to the point of vaporization rather than combustion. The articles, all attached to the November 7, 2017 Office Action, are as follows:

- "The Official Dab Dictionary" by Bobby Black, dated July 30, 2013, posted on the HIGHTIMES.COM website (TSDR 28-32);

- "The Vocab of Dab" by Laura Notini, dated May 21, 2015, posted on the CANNABISNOWMAGAZINE.COM website (TSDR 33-35);

- "Dabbing is Becoming a New Way to get High" (author unknown), dated June 13, 2012, posted on the THC.ME website (TSDR 36-41);

- "The Origins of Dabbing: Where Did it all Begin?" by Brandon Lee, dated March 14, 2016, posted on the HERB.CO website (TSDR 42-50); and

- "Dab Life: A Brief and Wondrous History of Concentrates and The 710 Phenomenon" by Barry Bluntman, dated March 19, 2012, posted on the MARIJUANA.COM website (TSDR 51-62).

To support his contention that Applicant's goods comprise illegal drug paraphernalia, the Examining Attorney points to Applicant's and third-party websites that promote Applicant's essential oil dispenser as a "dabbing" tool. *See Brown*, 119 USPQ2d at 1351-52 (Board may consider extrinsic evidence when determining whether the CSA prohibits a product). The evidence is as follows:

- Applicant's ORGANALABS.COM/brands webpage states: "Bakked is the creator of the Dabaratus, a portable multi-functional dabbing tool available

in four strains of Organa Labs oil: Indica, sativa, hybrid and CBD." November 7, 2017 Office Action, TSDR 23-24. And Applicant's ORGANABRANDS.COM website, displayed below, shows the goods pre-filled with "$CO_2$ extracted terpene rich distillate" on Applicant's homepage with the text: "Bakked products offer high purity and value to the cannabis market." *Id.*, at TSDR 9.



- Applicant's BAKKED.COM products webpage, displayed below, touts "THE DABARATUS" as "THE ALL-IN-ONE TOOL FOR DABBING":



The webpage advertises the "Dabaratus" as "AMONG THE BEST DAB TOOLS ON THE MARKET" that delivers "THE PERFECT DOSE OF CANNABIS EXTRACT." The text explains that the "Dabaratus" is designed to deliver "a consistent dose of Bakked's purest Cannabis oil. While other dab tools may waste some of the precious cannabis extract during dabbing, the Dabaratus is designed to dispense only what you need every time."



November 7, 2017 Office Action, TSDR 63-69 (at 65-66).

- In a February 1, 2017 press release issued by Applicant, titled "Organa Brands Brings Convenience and Innovation to the Cannabis Oil Market," subtitled "New Bakked Dabaratus is the Best Tool for Dabbing," posted on the MARKETWIRED.COM website, Applicant announced the launch of the

  Bakked Dabaratus, a clickable, all-in-one dabbing tool. The device is pre-filled with Bakked's award winning cannabis oil distillate and supplies a precisely metered dose for both medical and recreational users.

  The Bakked Dabaratus brings convenience to the widely popular dabbing market. Sleek, subtle and user-friendly, the device is a pre-filled pen with a button that releases a drop of indica, sativa or hybrid cannabis oil distillate which can be placed directly onto a heated dab rig due to the stainless steel tip. The device can also be used to dress edibles and other cannabis flower products. The size of the drop and amount is controlled by the individual and allows for the specific dosage desired by the consumer.

  A single click from the Bakked Dabaratus does away with the current inconvenience of dabbing and eliminates

> possible risk of spillage or residual mess, making it the most efficient dabbing product available.
>
> "Dabbing, while popular, requires multiple pieces of equipment and often results in a sticky mess," said Chris Driessen, President of Organa Brands. "The Dabaratus eliminates many of these problems by simplifying the process, while delivering a metered dose of ultra-pure distillate."

October 24, 2018 Office Action, TSDR 3-5.

- LEAFLY.COM, a third party website promoting Applicant's goods, touts the "Bakked Dabaratus," as an "All-in-one Dabbing Tool filled with 1 gram of Terpene Rich Distillate," and displays the goods as follows:



The "About Us" section on the LEAFLY.COM website states: "Our CO2 extracted high-potency cannabis products provide you with a clean and pure experience every time. Our artisan-crafted small batch distillation method allows for the widest range of terpenes and cannabinoids possible. All Bakked distillates are strain-specific and available in Indica, Sativa and Hybrid." And according to the "Product Details"

section, "The Dabaratus provides a clean, one-click solution for dabbing. Equipped with a heat resistant metal tip and infused with our terpene-rich distillate, the Dabaratus delivers unsurpassed purity and convenience for the diligent dabber."[7] November 7, 2017 Office Action, TSDR 21-22.

- A July 6, 2017 article titled "The Dabaratus[:] Available wherever Bakked products are carried" by Culture Magazine, posted on third-party website IREADCULTURE.COM, displays Applicant's goods (bearing both marks, as well as the "Dabaratus" mark), prefilled with cannabis distillate oils.[8] The article touts that Applicant's goods primarily are used for "dabbing": "If ever there was a cannabis product yearning for an infomercial, it's the DABARATUS. … The DABARATUS is a one-gram CO2 extracted, terpene-rich distillate-dispensing tool. This syringe dabs out a dose of distillate each time you push down to dispense. … The DABARATUS is completed with a heat resistant metal tip so you can dab directly onto your rig! As rich in body buzz as it is in flavor and simplicity, this tool is a must-have for those who worship at the throne of the dab." November 7, 2017 Office Action, TSDR 11-15.

---

[7] Another third-party website, FASTANDFRIENDLY.US, offers Applicant's "Dabaratus" for sale for $60. This website displays Applicant's goods with the applied-for marks, prefilled with cannabis distillate oils. In the "Product Description" section, the website advertises the goods using identical (or nearly identical) language as LEAFLY.COM. November 7, 2017 Office Action, TSDR 19-20.

[8] This display of Applicant's goods appears to be identical to the LEAFLY.COM display reproduced above.

This evidence amply supports a finding that Applicant's identified "essential oil dispenser, sold empty, for domestic use," which is sold by the "Largest Cannabis Company in the US,"[9] primarily is intended or designed for use in connection with preparing, inhaling or introducing marijuana into the human body via "dabbing." The consistent references in the evidence to the "pre-filled" version of Applicant's goods provides further support for this finding. Indeed, there is no evidence to support a finding that Applicant's goods are primarily intended or designed for any use other than as a "dabbing" tool. The identified goods therefore comprise prohibited drug paraphernalia, as defined in Section 863(d) of the CSA.

In making this finding, we have considered, but have found unpersuasive, Applicant's attempt to draw parallels between its goods and razor blades and postage scales. App. Br., 7 TTABVUE 18. Although razor blades and postage scales could be used to cut and weigh illegal drugs, they are not considered prohibited drug paraphernalia because razor blades primarily are intended for shaving, and postage scales primarily are intended for weighing letters and packages prior to mailing; unlike the demonstrated primary intended purpose of Applicant's goods, razor blades and postage scales are not specifically designed, or primarily intended, for use with inhaling or ingesting marijuana or other illegal drugs.

We also find unpersuasive Applicant's attempt to analogize its applications to several third-party registrations, which Applicant characterizes as evidence that "(i)

---

[9] November 7, 2017 Office Action, TSDR 16-18 (Applicant's November 7, 2016 press release posted on MARKETWIRED.COM).

the Office has previously registered many marks for goods that are traditionally intended for use with tobacco products that may also be used with cannabis products," and "(ii) it is not the practice of the Office to inquire as to the legal use of goods that are empty containers sold for use by others." App. Br., 7 TTABVUE 18. Most of the registrations are distinguishable from Applicant's goods because they specifically identify tobacco, traditional tobacco products (tobacco jars, tobacco grinders, rolling paper) or e-cigarettes, none of which are unlawful under the CSA or require additional inquiry. Regardless, each application must be considered on its own record to determine eligibility to register. *In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1635 (Fed. Cir. 2016); *see also In re Nett Designs, Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001) ("Even if some prior registrations had some characteristics similar to Nett Designs' application, the PTO's allowance of such prior registrations does not bind the Board or this court."). Further, the USPTO refuses registration of marks not used in lawful commerce, and will inquire about compliance with federal laws to support a refusal or otherwise facilitate proper examination. Trademark Rule 2.61, 37 C.F.R. § 2.61. The Examining Attorney properly followed this procedure by issuing a request for information in the first Office Action. December 22, 2016 Office Action, TSDR 1.

2.    Is Applicant Engaged in Activities Prohibited Under Section 863(a) of the CSA?

Under Section 863(a) of the CSA: "IN GENERAL It is unlawful for any person—(1) to sell or offer to sell drug paraphernalia; (2) to use the mails or any other facility of

interstate commerce to transport drug paraphernalia; or (3) to import or export drug paraphernalia."[10]

The evidence discussed above supports a finding that Applicant is selling or offering to sell the identified goods, which we have found to comprise drug paraphernalia, in violation of Section 863(a)(1) of the CSA.

The record also supports a finding that Applicant uses the mails or facilities of interstate commerce to transport drug paraphernalia in contravention of Section 863(a)(2) of the CSA. In particular, in response to Request for Information No. 1 from the Examining Attorney, which asked Applicant to explain how its goods are sold, Applicant stated: "Applicant sells its essential oil dispensers empty to wholesale distributors across the United States." May 3, 2018 Response to Office Action, TSDR 1. And in response to Request for Information No. 2, which asked Applicant to submit documentation of sales of the identified goods, Applicant submitted invoices showing that it used FedEx to ship its identified goods from Colorado to a customer in Berkeley, California. May 3, 2018 Response to Office Action Exhibit 3, TSDR 14-16. As the Examining Attorney notes, "FedEx is a common carrier who uses facilities of interstate commerce, such as trucks or airplanes, to transport Applicant's goods across state lines." Ex. Atty. Br., 11 TTABVUE 9.

---

[10] Because Section 863(a) of the CSA is written in the disjunctive, it is unlawful to violate any of the three subsections.

3.  Do Applicant's Goods Qualify for an Exemption, and if so, Does the Exemption Provide a Basis for a Federal Trademark Registration?

Having found that Applicant's identified goods comprise drug paraphernalia per Sections 863(d) and (e) of the CSA, and that Applicant has sold or distributed the drug paraphernalia by using facilities of interstate commerce, we now consider whether Applicant's goods qualify for an exemption under Section 863(f) of the CSA, and to the extent they do, whether Applicant therefore may obtain a federal trademark registration for a mark for such goods.

As set out above, Section 863(f)(1) of the CSA exempts "any person authorized by local, State, or Federal law to manufacture, possess, or distribute such items," and Section 863(f)(2) exempts "any item that, in the normal lawful course of business is imported, exported, transported, or sold through the mail or by any other means, and traditionally intended for use with tobacco products, including any pipe, paper, or accessory." We address each exemption in turn.

a.  Section 863(f)(1) – Authorization Under Local, State or Federal Law

Applicant argues that it is a "person authorized by … state … law to manufacture, possess or distribute" the goods, and as such, it is exempted under Section 863(f)(1) of the CSA from the prohibitions of the drug paraphernalia provisions discussed above. This appears to be a matter of first impression at the Board. And while that might ordinarily mean we are obliged to resolve the matter, in this case, we do not need to reach the merits of Applicant's argument. Even if Applicant's interpretation

of the Section 863(f)(1) exemption is correct, it is not entitled to the registration it seeks.

First, the rights Applicant seeks are not limited to Colorado. A federal registration would give Applicant presumptive exclusive rights to nationwide use of its mark in association with the identified goods under Section 7(b) of the Trademark Act, 15 U.S.C. § 1057(b). *Cf. Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 218 USPQ 390, 393 (Fed. Cir. 1983) ("Applicant seeks a geographically unrestricted registration under which it might expand throughout the United States. Under these facts, it is not proper, as the TTAB found, to limit our consideration to the likelihood of confusion in the areas presently occupied by the parties. Section 7(b) of the Trademark Act of 1946, 15 U.S.C. § 1057(b), creates a presumption that the registrant has the exclusive right to use its mark throughout the United States. Therefore, the geographical distance between the present locations of the respective businesses of the two parties has little relevance in this case.").

Second, even accepting Applicant's argument as to the meaning of the Section 863(f)(1) exemption, any authorization by Colorado of Applicant's manufacture, possession or distribution of the goods cannot override the laws of the other states or federal law outside Colorado. A recent decision by the United States Court of International Trade illustrates this point. In *Eteros Techs. USA, Inc. v. United States,* 592 F. Supp. 3d 1313 (Ct. Int'l Trade 2022), the court interpreted the Section 863(f)(1) exemption and found the plaintiff "authorized" "and thereby exempted in Washington

State from subsection 863(a)'s prohibition on importing drug paraphernalia."[11] In the *Eteros Tech.* case, the court's interpretation of the Section 863(f)(1) exemption meant the government had no basis to seize and hold the goods.

In reaching this result, however, the court noted that "Washington State can only 'authorize' persons to partake in the enumerated activities of the (f)(1) exemption within the confines of its own borders; if the drug paraphernalia leaves Washington, the 'authoriz[ation]' inquiry begins anew in the context of the new state."[12] While Applicant may be correct that Colorado has authorized it to manufacture, possess or distribute the goods, such authorization does not extend beyond the borders of Colorado. The Section (f)(1) exemption argued for here is tied to a geographic area— that is, Applicant argues it is authorized by Colorado law to manufacture, possess or distribute the goods in Colorado. But that exemption is insufficient to support the federal trademark registration Applicant seeks, which would be nationwide in effect. *Compare Brown*, 119 USPQ2d at 1351 ("[T]he fact that the provision of a product or service may be lawful within a state is irrelevant to the question of federal registration."). We hold that when a Section 863(f)(1) exemption is applicable based on state law, that exemption does not support federal registration.

---

[11] *Id.* at 1320. *Accord Keirton USA, Inc. v. United States*, 600 F. Supp.3d 1270 (Ct. Int'l Trade 2022) (finding it "lawful for [the plaintiff] to possess and import its merchandise into the State of Washington[,]" such "merchandise" being "parts and components" used to manufacture the plaintiff's "Twisted Trimmer," which the plaintiff sells "to companies in the State of Washington that process marijuana plants."). *In Eteros Tech*, the plaintiff moved for judgment on the pleadings, and stipulated for the purposes of its motion that the goods met the federal statutory definition of "drug paraphernalia" under Section 863(d) of the CSA. *Eteros Tech.*, 592 F.Supp.3d at 1319.

[12] *Id.* at 1331 n.27.

b. Section 863(f)(2) – Traditional Tobacco Products

Applicant contends that the identified essential oil dispensers could be used to dispense tobacco oil, and thus qualify for an exemption under Section 863(f)(2) of the CSA because the goods "are of the type traditionally intended for use with tobacco products."[13] App. Br., 7 TTABVUE 14. As support, Applicant submitted some evidence indicating that tobacco oils have been used in the past for medicinal reasons, and printouts from third-party online sellers DHGATE.COM and ALIBABA.COM offering a handful of items identified as bottles for tobacco oil or tobacco tar. May 3, 2018 Response to Office Action Exhibit 2, TSDR 11-13; April 24, 2019 Request for Reconsideration Exhibit C, TSDR 29. This dearth of evidence does not persuade us that "essential oil dispensers, sold empty, for domestic use," "traditionally" have been used for tobacco based oils or substances. Moreover, none of the items shown on the printouts are described as or resemble the goods on which Applicant uses its marks, based on Applicant's specimens and the website evidence displaying Applicant's goods, discussed above. *Cf. BBK Tobacco & Foods LLP v. Central Coast Agri. Inc.*, ___ F.Supp.3d ___, 118 Fed. R. Evid. Serv. 1980, Slip Op., 2022 WL 2820144, at *29-30 (D. Az. 2022) (granting summary judgment to plaintiff on defendant's unlawful use counterclaim, finding "as a matter of law, the goods listed in connection with the challenged registrations fall within the tobacco exemption, § 863(f)(2), because such goods are either rolling papers expressly exempted, or accessories used in connection

---

[13] We do not consider any arguments about other essential oils, as this exemption is limited to traditional tobacco products. We also note that nothing in the record supports a finding that Applicant uses its marks on anything other than an apparatus used to dispense cannabis-based oils for vaping through the process of "dabbing."

with rolling papers, such as rolling trays, cigarette tubes, rolling machines, and shredders and grinders for tobacco and other smokeable herbs.") (internal citations omitted); *Lifted Ltd., LLC v. Novelty Inc.*, Slip Op., 2021 WL 4480566, at \*3 (D. Col. 2021) (denying defendant's "Motion to Decline Subject Matter Jurisdiction for Illegality," finding that the "Toker Poker" (tamper, cigarette holder and poker) "is an item that is traditionally used for tobacco and, as a result, is not drug paraphernalia pursuant to § 863.").

III.    Conclusion

Applicant cannot obtain federal registrations of its marks because Applicant's identified goods constitute drug paraphernalia under the CSA, the exemption in Section 863(f)(1) asserted by Applicant, based on state law, does not support federal registration, and the exemption in Section 863(f)(2) does not apply.

**Decision**: The refusal to register Applicant's marks BAKKED and under Sections 1 and 45 of the Trademark Act is affirmed in both applications.